# THE STATE v. JOHN M. CRANE, Appellant.

### Division Two, March 5, 1907.

1. **CHANGE OF VENUE: Disqualifying Judge: Affidavit Made by Attorney.** Where defendant's attorney of record files a motion for a change of venue on the ground of the bias and prejudice of the judge against defendant, and himself makes the affidavit, and that is supported by the affidavit of two reputable persons, and the court grants the motion and calls in another judge to try the cause, the jurisdiction of this judge is not ousted because the affidavit was made by the attorney instead of by defendant himself. The defendant having authorized his agent and attorney to make the defective application, and having availed himself of it, and through it obtained the change, he cannot be heard to repudiate it. But aside from all that, in this case defendant is bound by the order of the court because he saved no exceptions to the court's actions at the time.

2. ————: **Defective Application: Irregularity: Exceptions.** A defective application for a change of venue is a mere irregularity and will not render void the order making the change; but being an irregularity, the defendant must make his objections at the time the order is made and preserve them by a bill of exceptions if he desires to have them reviewed in the appellate court; and if he does not do that, he will be held to have waived them.

3. **GRAND JURY: Challenging Array.** A defendant cannot complain of the manner of impaneling a grand jury who have been summoned and sworn and were in session when he killed deceased. And had the jury been selected after the homicide, any objection to the manner of selecting or impaneling the jurors (in this case, that they were selected and named from a list prepared by the judge), cannot avail the defendant, for the statute specifies as the only grounds of challenge of a grand juror these, namely, that he is a prosecutor or a complainant or a witness, etc.

4. **CONTINUANCE: Absent Witnesses: Insufficient Affidavits: Diligence: Cumulative Evidence.** Where no subpoenas were asked for for absent witnesses until after the date set for the trial, and the application for a continuance does not state the grounds or reasons for believing they would testify to the things it alleges they would, and some of them were non-residents and no excuses were given for failure to take their depo-

sitions or assurances stated that their depositions could now be taken, and some of them were residents of the State and no reason is stated why they were not subpoenaed, and the application reveals that the things it is alleged those witnesses would testify if present are the same things that numerous other witnesses did testify at the trial, and there is no reason for believing the jury would have rendered a different verdict had the resident witnesses been present and depositions of the non-resident witnesses been taken and read, there is nothing to indicate that the trial court unwisely or oppressively exercised its discretion in denying the continuance.

5. **STATUTE: Effect of Revision on Prior Statute and Common Law: Insanity Inquiry.** A statute is impliedly repealed by a subsequent one revising the whole subject-matter of the first, and in case of a statute revising the common law the implication is equally as strong. And so it is held that the statutes providing for insanity inquiries of persons charged with crimes govern, and whatever might have been the procedure at common law or may be the procedure in other States, these statutes mark out and control the procedure in this State.

6. **INSANITY AS DEFENSE: Independent Inquiry.** When a person charged with a crime becomes insane after his indictment, a separate inquiry into his sanity may be had in the way the statute provides; but where the insistence is that he was insane when the offense was committed, then his insanity is available as a defense before the same jury in his trial of that offense. It is not error for the trial court to overrule a motion for a preliminary independent inquiry into the defendant's insanity at the time he committed the crime.

7. **JURORS: Panel: Reading Account of Crime After Selection.** A motion to quash the entire panel of jurors on the ground that since the impaneling and examination of those selected on the panel, a prejudicial account of the murder with which defendant is charged and of the proceedings in impaneling the jurors has appeared in a local newspaper of wide circulation, should be overruled, if defendant's attorneys do not ask the privilege of further examining the jurors to see if any of them have become disqualified or have read the account; and if they did not object or save an exception because the court did not do this for them, it will be too late on appeal to raise the question.

8. **INSANITY AS DEFENSE: Instruction.** The issue at the trial is whether or not defendant killed the deceased, and the jury should be told that if he was not then insane and murdered deceased they should find him guilty "even though you may

believe and find from the evidence that he has become insane since the homicide and that he is now insane."

9. ————: **Expert Testimony: Instruction.** Opinions of medical experts do not establish or tend to establish the facts upon which they are based, and whether the matters testified to by the witnesses as facts are true or false is to be determined by the jury alone, and no error is committed in so instructing the jury.

10. ————: **Statements and Conduct of Defendant: Rebuttal.** It is proper to permit the State in rebuttal to prove the conduct and statements of defendant at the time of the homicide and prior thereto, to rebut the issue of insanity raised by defendant. And the fact that some of that evidence was not strictly in rebuttal, is no ground for reversing the judgment, because the court has a large discretion as to the order in which testimony is introduced.

11. ————: **Question for Jury.** The jury is the tribunal charged with the duty of determining whether or not defendant was insane when he committed the homicide, and in the absence of any improper instruction and of any testimony tending to show that they were governed by passion or prejudice, the court will not interfere with their verdict.

Appeal from Jackson Criminal Court.—*Hon. B. J. Casteel,* Special Judge.

AFFIRMED.

*W. C. Reynolds, A. C. Durham* and *Milton Oldham* for appellant; *Boyle, Guthrie & Smith* of counsel.

(1) The regular judge, Wofford, was not properly disqualified; hence, there was no authority under the law for Casteel, special judge, who tried the case, to act. Secs. 2594, 2595, R. S. 1899. Defendant was the only proper person to make the affidavit. State v. Thomas, 32 Mo. App. 159; State v. Brownfield, 83 Mo. 452; State v. Shipman, 93 Mo. 157; State v. Sumner, 143 Mo. 228. (2) The plea in abatement and motion to quash should have been sustained. The grand jury that indicted the defendant was not drawn and summoned as provided

by law.  It was in session at the time when, the homi-
cide took place.  It had been called shortly prior to this
date, and the motion to quash and the plea in abatement
was leveled at the method employed in the selection of
the jurors.  Sec. 3770a, Laws 1901, p. 192.  The judge
of the criminal court of Jackson county was authorized
under this law to call a grand jury.  The law, however,
provides the manner in which the jurors must be se-
lected.  Instead of following the provisions of the law
the court made out a list himself and instructed the mar-
shal whom to subpoena.  The State filed no pleadings
in answer to the plea in abatement.  We contend that
the allegations of the plea in abatement must be taken
as true.  State v. Austin, 183 Mo. 478.  (3)  Defend-
ant's applcation for a continuance was sufficient and
should have been granted.  Defendant had been a rail-
road man, and it was necessary to communicate with
a great number of people in order to ascertain facts
pertaining to his life.  The application for a contin-
uance was made in good faith, and this man's rights
were prejudiced by the overruling of the motion.  State
v. Warden, 94 Mo. 648; State v. Anderson, 96 Mo. 250;
State v. DeWitt, 152 Mo. 85; State v. Loe, 98 Mo. 609.
(4)  The motion to inquire into the sanity of defendant
should have been sustained.  The motion was filed be-
fore the jury was empaneled.  It may be contended
that it is discretionary with the court whether this in-
quiry should be made.  However, when uncontradicted
testimony of a reputable character is presented, demon-
strating beyond peradventure that the defendant about
to be tried is then insane, we contend that it is the duty
of the court to inquire into that fact and that the failure
to so inquire would be an abuse of discretion.  Any
other rule would lead to monstrous results.  State v.
Jones, 13 Ala. 157; State v. Conrad, 105 Ia. 21; Com.
v. Braley, 1 Mass. 102; People v. Ah Ying, 42 Cal. 18;
Freeman v. People, 4 Denio 9; Guangando v. State, 41

Tex. 626; Taffe v. State, 23 Ark. 34; Com. v. Hathaway, 13 Mass. 229; Gruber v. State, 3 W. Va. 699. (5) The court should have sustained defendant's motion to quash the panel of jurors. This motion was made in writing and challenged the court's attention to the fact that, after the forty-seven jurors had been qualified, and prior to the selection of the twelve out of the forty-seven, the press of Kansas City took occasion to write certain articles criticising Crane in a most vicious manner, and seeking to prejudice his case on the theory that he was acting a part before the jury. This article was made a part of the motion and set out in full. State v. Hottman, 196 Mo. 110. It will be observed that the record does not disclose that the court admonished the jury after the forty-seven had been empaneled that they should not read the public press in reference to this matter, to the end that their minds be kept free from bias. It is true that counsel for the defendant might have re-examined the jurors, as was suggested in the Hottman case, but the court without a moment's delay, and before counsel had an opportunity of taking any futher steps in the matter, overruled the motion. In the case at bar the court did not pursue the course followed in the Hottman case, wherein the judge himself interviewed the jurors to ascertain if any of the jurors had read the prejudicial articles. In the Hottman case four of the jurors had read the articles and were prejudiced thereby. These jurors were excused. Hence, any damage that might have been done by the newspaper articles was corrected. Nothing of the kind was done in the case at bar, but defendant was shoved into the trial in the face of an atmosphere created by these prejudicial newspaper reports.

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1) Whether the application of defendant for a change of venue from the regular judge was regular

in form or not, that court had jurisdiction of the subject-matter and the person of the defendant, sustained defendant's application for such change and called in Casteel as special judge to try the cause. The defendant did not except to the action of the court in granting such change of venue at the time, but recognized the jurisdiction of said special judge when he appeared to try said cause. State v. Gamble, 119 Mo. 430; State v. Ware, 69 Mo. 332; Stearns v. Railroad, 94 Mo. 317; State v. Linn, 169 Mo. 664; State v. Taylor, 132 Mo. 286. (2) The court did not err in overruling defendant's plea in abatement and motion to quash the indictment. The said plea and motion to quash were based upon an alleged irregularity in the selection of the grand jury. It appears in the record that the grand jury which returned the indictment was organized and in session at the time of the alleged homicide. The grounds upon which a grand juror may be challenged are set forth in section 2487, Revised Statutes 1899, and such right of challenge is given only "to any person held to answer a criminal charge." Sec. 2488, R. S. 1899; State v. Connell, 49 Mo. 287; State v. Knight, 61 Mo. 373; State v. Holcomb, 86 Mo. 371; State v. Reed, 162 Mo. 312; State v. Welch, 33 Mo. 33. (3) The court did not err in overruling defendant's application for a continuance. A consideration of the motion and affidavit and the facts disclosed by the record will show that there was a want of due diligence by defendant to secure the evidence of the alleged absent witnesses, and, further, that there was no abuse of discretion on the part of the court in overruling said motion. State v. Woodward, 182 Mo. 391; State v. Blitz, 171 Mo. 350; State v. Sims, 68 Mo. 305. Defendant's failure to have subpoenas issued until after the day the cause was set for trial showed a want of due diligence. State v. Murphy, 46 Mo. 430; State v. Emory, 79 Mo. 461; State v. Goode, 132 Mo. 114; State v. Thompson, 132 Mo. 301;

State v. Bryant, 93 Mo. 273. Besides, the facts as set forth in said affidavit which it is alleged the absent witnesses would prove if present, would have been merely cumulative to the evidence given in defendant's behalf at the trial, and it was not an abuse of discretion in the court to overrule the motion. State v. Tettaton, 159 Mo. 354; State v. Webster, 152 Mo. 87; State v. DeWitt, 152 Mo. 76. (4) The court did not err in overruling the motion to inquire into the sanity of defendant. Sec. 2603, R. S. 1899. The fact that the court is given the power to try such question of insanity in advance of the trial of the charge in the indictment only when such person becomes insane after his indictment, implies that it does not give authority to the court to direct such inquiry in cases where the insanity was alleged to exist before as well as after the indictment was found. Section 2606, Revised Statutes 1899, providing for the disposition of persons tried for crime wherein the defense of insanity is interposed, clearly indicates the correctness of this construction. (5) The court did not err in overruling defendant's motion to quash the panel of jurors. Defendant did not ask to examine the said jurors for the purpose of ascertaining if any of them had read said article. The case of State v. Hottman, 196 Mo. 110, decides this contention against appellant.

*W. C. Reynolds* and *A. C. Durham* for appellant in reply; *Boyle, Guthrie & Smith* of counsel.

(1) The court committed manifest error in instruction 7. The following portion of said instruction is erroneous: ''Those opinions neither establish nor tend to establish the truth of the facts upon which they are based.'' (2) Defendant interposed timely objections to testimony as to the defendant's drinking and being drunk. These objections the court overruled and permitted this line of testimony in rebuttal. Having

made timely objection when this line of testimony was first brought out, it was not necessary for the defendant to repeat these objections thereafter. The State should not be permitted to introduce testimony in rebuttal that should have been introduced in its case in chief. This testimony was not in rebuttal and should have been introduced, if at all, by the State in its case in chief. Christal v. Craig, 80 Mo. 375; Glenn v. Stewart, 167 Mo. 593.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State in reply.

(1) Instructions of which those now complained of are substantially transcripts have been many times approved by this court. State v. Duestrow, 137 Mo. 44. (2) Appellant complains that the court permitted the State in rebuttal to prove conduct and statements of the defendant at the time of the homicide and prior thereto over the defendant's objection. The defense was insanity, and it was clearly competent for the State to prove the matters complained of to meet the issue thus made. But even if the defendant's objection that such evidence was "not in rebuttal, but a part of their case in chief," be correct, as that is a matter within the sound discretion of a court, reversible error could not be predicated upon such ruling. State v. Thornhill, 177 Mo. 691.

GANTT, J.—At the April term, 1905, of the Jackson Criminal Court, the grand jury returned an indictment charging the defendant with murder in the first degree of Henrietta Crane. On the 15th of July, 1905, the defendant was duly arraigned upon said indictment and refused to plead thereto, but stood mute, whereupon the court directed that a plea of not guilty should be entered for the defendant, and that the cause be con-

tinued until the October term, 1905. On the 16th day of October, 1905, the defendant, by his attorney, W. C. Reynolds, filed an application for a change of venue from the regular judge of said court on the ground of the bias and prejudice of said judge against him. The motion for change of venue was signed by the defendant by W. C. Reynolds, his attorney, and was sworn to by the latter. This application was supported by the affidavit of two other witnesses to the effect that they were neither of kin nor counsel to the defendant, and that Judge Wofford would not give the defendant a fair and impartial trial on account of the bias and prejudice of said judge. The application for change of venue was thereupon granted and Judge B. J. Casteel, judge of the criminal court of Buchanan county, was notified and requested to preside as special judge in said cause, and the cause was set down for October 17, 1905. On the 17th of October, 1905, Judge Casteel appeared and assumed the bench and thereupon the defendant withdrew his plea of not guilty, and filed a plea in abatement, and a motion to quash the indictment.

The plea in abatement alleged that the grand jury which indicted the defendant was not drawn and summoned from the body of Jackson county, as by law required, but was selected and named from a list prepared by the judge without legal authority therefor, and prayed that the same might be quashed. The motion to quash contained the same grounds, with the additional charge that the indictment failed to state facts sufficient to constitute a crime. In support of the motion to quash and the plea in abatement the defendant offered in evidence the testimony taken in another case of the State against Miller in the same court wherein the indictment was challenged and an effort made to show that the grand jury had been summoned by the marshal from a list furnished him by Judge Wofford, but in which hearing there was no evidence to sustain

said charge and the motion in the Miller case was over-ruled and thereupon both the plea in abatement and motion to quash were overruled by Judge Casteel in this case.

Thereupon, the defendant filed an application for change of venue to some other county on the ground of the prejudice of the inhabitants of Jackson county, which application was supported by affidavits of two other witnesses. No notice of the making of this application had been given the prosecuting attorney by the counsel for the defendant prior to the filing of the same and thereupon the court overruled said application.

The defendant then filed an application for a continuance on the ground of the absence of witnesses, which application having been heard was by the court overruled.

The defendant then filed a motion by and through his attorney, W. C. Reynolds, Esq., for an order of the court to inquire into the sanity of the defendant, which motion was also overruled.

A motion to quash the panel of jurors summoned to try the cause was then made by the defendant and overruled by the court.

At this stage of the proceedings, the defendant by another attorney, M. J. Oldham, filed a plea to the jurisdiction of the court, or rather to the jurisdiction and right of Judge Casteel to preside in the cause on the ground that the defendant himself did not make the affidavit disqualifying Judge Wofford, and that therefore Judge Wofford's order calling upon Judge Casteel to preside was void. This plea to the jurisdiction was also overruled.

Thereupon, the defendant was rearraigned and re-entered his plea of not guilty, and the jury impaneled and sworn to try the cause, and after hearing the evidence and the argument of counsel, and the instructions of the court, returned a verdict of guilty of mur-

der in the first degree. In due time motions for new trial and in arrest of judgment were filed, heard and overruled, and the defendant was sentenced in accordance with the verdict. From that sentence he appeals.

The testimony on behalf of the State tended to prove the following facts:

At the time of the homicide the defendant was about fifty-five years of age and resided in Kansas City, Missouri. He was born in the State of Illinois, and in his early manhood, and at different times thereafter, was a fireman and locomotive engineer in the service of different railroads. He had also been engaged in the dramshop business at Lowry City, St. Clair county, Missouri, and in the city of St. Louis, and had also been engaged in the grocery business in Memphis, Tennessee. He owned some mining property at Baxter Springs, but the evidence would seem to indicate that he had no considerable property when he was married to the deceased, Henrietta Crane. Mrs. Crane, the deceased, wife of the defendant, was from sixty-three to sixty-five years old at the time of her death, and was then, and for about two years prior thereto had been, residing at number 1101 Bayles avenue in Kansas City, Missouri. Prior to her marriage to the defendant she had been the wife of Mr. Evans, and had lived with him at Harrisonville, Missouri, where he died about seven years before, leaving her an estate valued at from twenty-five thousand to thirty thousand dollars. The defendant had been twice married prior to his marriage to the deceased. The evidence tended to show that the defendant was a dressy, neat-appearing man, and that sometime in the spring of 1904, he called at the home of Mrs. Evans and introduced himself and represented to her that he had been a friend of her former husband twenty years before. In the month of June, 1904, the defendant and the deceased were married, and he came to her home in Kansas City to live. Within a few months after the marriage, he obtained deeds from

her to himself, through an intermediary, conveying
the property in which they lived, a quarter section of
land in Cass county, and she had also turned over to
him $15,000 in cash; the property and money so trans-
ferred to him  being all she had, and of the value of
thirty thousand dollars.   It further appeared in evi-
dence that when Mrs. Crane, the deceased, refused to
sign an order to him for money, he threatened to kill
her unless she did as he requested, and that she then
complied.  He invested a part of the money received in
mining property at Joplin, Missouri.   After securing
the property, he began to mistreat his wife, and at one
time she ran to a neighbor's house to escape from him;
he followed her and because of his threats and angry
manner, he was ordered not to come into the house.
After his marriage, he was away from home looking
after his mining property much of the time, and drank
to excess when he returned; his treatment of his wife
was such that in March, 1905, she instituted an action
for divorce from him and to recover the property he
had secured from her.   He was enjoined and restrained
by the court from entering upon the premises where
his wife lived until the further order of the court.
After her trouble with the defendant, Mrs. Crane
placed her business in the hands of Mr. D. J. Evans, her
former husband's brother, who then resided in Kansas
City.   Shortly before the divorce case was set for trial,
the defendant sought an interview with his wife and
requested Mr. D. J. Evans to arrange for the meeting
between them.  She refused to see him, and on the 8th
day of July, 1905, after the defendant had been in the
saloon drinking, he went to the residence of Mr. D. J.
Evans between five and six o'clock in the afternoon.
He again wanted to see his wife and when informed
that she would not see him, replied, ''Well, I will make
her see me.''   He then went a short distance from the
Evans home to that of his wife, arriving at the latter

place about seven o'clock in the evening. Her home was in the thickly-settled part of the city, and many of the residents of that neighborhood were sitting on their porches, at the time. The deceased was sitting on her porch reading a newspaper, which she held in front of her face; and did not see the defendant approach until he was within a few feet of where she sat. As soon as she saw him, she jumped up, opened the screen door, and ran into the house. The defendant immediately drew his revolver and fired at her, the bullet going through the screen door, breaking the glass in the front door and going through an outer window on the north side of the house. He immediately followed his wife inside and a second shot was heard in the house. His wife was in the house but a few minutes when she ran out through the same door she had entered, down the steps and diagonally across the street. The defendant was pursuing her and was within two or three feet as they came down the steps and across the street. He fired at her when she was leaving the steps and twice when she was crossing the street. A neighbor across the street towards whose house the deceased was running, ran down to meet her; she called to him, saying, "Take this man away from me." As she reached the curb the last shot was fired, she fell into the neighbor's arms, and being laid on the ground expired in a few minutes. As soon as she fell to the ground, the defendant started to run away, but was seized by a Mexican, who was passing, and thrown to the ground and held there. While they were holding the defendant on the ground, one of the bystanders said, "Your wife is dead, what did you kill her for?" He answered, "Wait till you hear my trial and hear the evidence, and you will see where I am justified." He then said that he was not an outlaw, it wasn't necessary to hold him, that "he came out there to kill her and had killed her, and that was all there was to it." The homicide was witnessed

by many persons and there is no material difference in the facts as testified by the several witnesses. At the police station that night the defendant made a lengthy statement concerning the shooting and the trouble with his wife, in which he stated the shooting was in self-defence. The post-mortem examination of the body of the deceased disclosed two bullet wounds, one a mortal wound, in which the bullet entered the body from behind between the eighth and ninth ribs, to the right of the spine, and going out through the body to the left upward and forward through the cartilage of the fourth rib a little higher than the central portion of the heart; the bullet cut the main artery, passing downward from the heart, and also cut the covering of the heart. The other wound was found in the back part of the arm.

The defense was insanity, and there was evidence both by lay and expert witnesses tending to establish that defense, among others, Mrs. Mary A. Logan, the wife of Cyrus Logan, and a first cousin of the defendant. She had known the defendant since 1853 or 1854, and at her house the defendant had boarded in 1901, and very frequently called at her house during the three months prior to the killing of his wife. She was of the opinion, on account of his conduct and action, that he was insane when she saw him on the fourth of July and on the day of the homicide. She judged this from the expression of his eyes and his face and his incoherent manner of talking.

Mrs. Browning, who was a sister of the defendant's second wife, had known him for a number of years and had seen him quite often just prior to the homicide, was of the opinion that he was insane on account of the expression of his eyes and face and his nervous, disconnected way of talking.

Cyrus Logan, his first cousin on his mother's side, had known him since 1853 or 1854, and testified that he acted strangely, and from his conduct and the ex-

pression of his face, he made up his mind that on the fourth of July the defendant was unbalanced and insane.

These witnesses also testified to the insanity of Benjamin Logan, an uncle of the defendant, who died in the insane asylum at Fulton, and to the insanity of Cora Freeman, an aunt of the defendant, and to the insanity of Enoch Logan, an uncle of the defendant.

C. D. Crane, a brother, also testified to facts and circumstances indicating that the defendant was of unsound mind. The defendant also called three physicians who qualified as experts on insanity, who testified, upon a hypothetical case based upon the evidence introduced in behalf of the defendant, that in their opinion the defendant was insane.

In rebuttal the State introduced twelve witnesses, the defendant's neighbors, who had seen and talked with him often for more than a year before the homicide, and they all testified that there was nothing in the speech, conduct or appearance of the defendant that indicated any symptoms of insanity as far as they could observe.

The indictment is in all respects sufficient, both in form and substance, and such as has been often approved by this court. It is unnecessary to set it out at length in this statement.

I. Addressing ourselves to the assignments of errors urged for the reversal of this judgment, the first proposition of the defendant is that the criminal court erred in calling Judge Casteel, the judge of the criminal court of Buchanan county, to try this cause, because Judge Wofford, the regular judge of the criminal court of Jackson county, was not legally disqualified.

By section 2594, Revised Statutes 1899, it is provided that "when any indictment or criminal prosecution shall be pending in any circuit court or criminal court, the judge of said court shall be deemed incom-

petent to hear and try said cause . . . when the
defendant shall make and file an affidavit, supported by
the affidavit of at least two reputable persons, not of
kin to or counsel for the defendant, that the judge of
the court in which said cause is pending will not afford
him a fair trial.'' And by section 2597 it is provided
that, ''If, in any case, the judge shall be incompetent
to sit for any of the causes mentioned in section 2594
. . . the judge of said court shall set the cause down
for trial on some day of the term, or on some day as
early as practicable in vacation, and notify and request
the judge of some other circuit to try the cause; and
it shall be the duty of the judge so requested to appear
and hold the court at the time appointed for the trial
of said cause.'' As already indicated in the statement,
the defendant in this case filed his motion alleging that
Judge Wofford was prejudiced against him, and would
not afford him a fair and impartial trial, and his at-
torney, W. C. Reynolds, made the affidavit as agent and
attorney, and his affidavit was supported by that of two
other citizens as required by the statute, and upon this
showing Judge Wofford made an order calling in Judge
Casteel to preside in the case. The sole ground upon
which this alleged error is predicated is that the statute
is mandatory, and that the defendant himself alone
could make an affidavit against Judge Wofford and not
his attorney and that therefore Judge Casteel was with-
out authority in law to preside in the cause. This con-
tention has never been before made in this court. And
we are now called upon for the first time to say that
where the attorney of record for a defendant in the
name of the defendant, makes and files an affidavit of
prejudice against the regular judge of the court, sup-
ported by the necessary affidavits of other witnesses as
required by the statute, and the court grants the ap-
plication of the defendant, the defendant is not bound
thereby, and that all the acts of the court held by the

judge called in to try the cause, were and are absolute nullities.

We must decline to so hold.

In the case of State v. Downs, 164 Mo. 471, the regular judge of the court being disqualified to try the case, an attorney possessing the qualifications of a judge of the circuit court was called upon, in writing, as a special judge to try the cause, this agreement having been made by the prosecuting attorney and counsel for the defendant. The special judge was selected, presided at the trial, and after conviction, the point was made by the defendant that the special judge was without authority of law to act as judge in the case. In answer to that contention this court said: "Was it competent for the attorneys of the defendant to agree upon the special judge? The record contains the written agreement of the defendant by his counsel. There is a general concurrence of authority that, subject to the rule that an attorney cannot compromise his client's case, any agreement or stipulation which appears in the progress of a cause to be necessary or expedient for the advancement of the client's interests, may be made for his client by an attorney. In Ohlquest v. Farwell, 71 Iowa 233, the Supreme Court of Iowa said: 'The choice of proceedings, the manner of trial, and the like, are all within the sphere of his general authority, and, as to these matters, his client is bound by his action.' Especially is it true when such stipulations are entered into in open court. If this were not true, the most hurtful consequences must often ensue. We think it was competent for the counsel for the defendant to make this stipulation in behalf of the defendant, and that he is bound thereby."

The right of a change of venue is a privilege accorded to the defendant alone in a criminal prosecution. The question before us is not whether the defendant's application was in strict conformity to the statute made for his benefit, nor whether the criminal court might

have refused to grant it because it did not comply with the statute, but whether having made this defective application, and had it granted and availed himself of it, he can now be heard to repudiate it. We think upon the plainest principles of justice and public policy he should be bound by it. But there is another conclusive reason why this objection cannot be sustained. When the order was made calling in Judge Casteel to try this cause, no exception to the action of the court was taken by the defendant or his counsel. This court in numerous cases has ruled that a defective application for a change of venue is a mere irregularity and will not render the order making the change void, and being a mere irregularity, the defendant must make his objection at the time the order is made and preserve it by a bill of exceptions, if he desires to urge it in this court. Being a matter of exception, we have no doubt of the right of the defendant to waive it. It involved in no sense a waiver of any constitutional right, but as was said in State v. Taylor, 132 Mo. l. c. 287, "But in this case the defendant was not waiving any right. He was simply obtaining a privilege by a more speedy route than that accorded him by the statute. A defendant in a criminal case in which his constitutional rights are not invaded, can no more be allowed to deal unfairly with the court and the State than a party in a civil case. Having made his election and the court having awarded him a change of venue at his own request, he cannot complain of the privilege granted him." [State v. Gamble, 119 Mo. 427; State v. Keele, 105 Mo. 38, and cases cited.]

II. It is next asserted that the court erred in overruling the defendant's plea in abatement and motion to quash the indictment. As already seen, this plea and motion were based solely upon an irregularity in the selection of the grand jury. It appears in the record that the grand jury which returned the indictment in

this case had been impaneled, charged and sworn prior to the alleged homicide in this case, and were in session at the time defendant killed his wife. These objections in this case were in the nature of a challenge to the array. Our laws on the subject of challenging the array of individual members of the grand jury have been practically unchanged since 1845. Section 2487, Revised Statutes 1899, provides that, "Any person held to answer a criminal charge may object to the competency of anyone summoned to serve as a grand juror, *before he is sworn*, on the ground that he is the prosecutor or complainant upon any charge against such person, or that he is a witness on the part of the prosecutor, and has been summoned or bound in a recognizance as such; and if such objection be established, the person so challenged shall be set aside." Section 2488, "No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other cases than such as are specified in the last section." As early as 1853, these provisions were construed in State v. Bleekley, 18 Mo. 428. In that case, a plea in abatement was filed on the ground that the grand jury that preferred the indictment had not been summoned and selected according to the statute. Judge RYLAND, speaking for this court, said: "In early days, in this State, it was common for the courts to grant new trials in criminal cases on account of some disqualification of jurors. Frequently, after undergoing the labor and expense of a trial, lasting for days, and after a verdict of guilty was found, a new trial was ordered because the prisoner had discovered that one of the jurors was an alien. The Legislature determined to put a stop to this practice, and declared that 'no exception to a juror, on account of his citizenship, non-residence, state or age, or other legal disability, shall be allowed after the jury is sworn.'" The learned judge then quotes sections 2 and 3 of article 3, Practice and Proceedings

in Criminal Cases, Rev. Code 1845, which are identical
with sections 2487 and 2488, Revised Statutes 1899,
above quoted, and further discussing the plea in abate-
ment, remarked, "they [the Legislature] supposed all
objections to juries, either grand or petit, must, under
the laws of the State, *be made at the time when about
to be sworn*, and for the causes in the statute mentioned.
. . . . The defendant is not permitted to question
the manner of summoning the grand jury; such a cause
on such a subject is not one of the statutory objections
allowed to grand juries or to a grand juror in our
courts, and none other can avail." The plea in abate-
ment was held ineffectual.

In State v. Welch, 33 Mo. 33, the same point was
ruled in the same way. In State v. Holcomb, 86 Mo. 1.
c. 376, Judge BLACK, speaking for this court, said:
"Challenge to the array, or to any one of the grand ju-
rors, is no longer allowed, except on the ground that
the juror is the prosecutor or complainant, or a witness
on the part of the prosecution. [R. S. 1879, secs. 1772,
1773.]" In that case, as in this, it appeared that "the
plea does not claim that the jurors, or any of them,
were objectionable for these, or, indeed, for any rea-
son," and the court ruled that "it would be a mere idle
ceremony to sustain the plea, when the defendant
makes and has no valid ground for a challenge." To
the same effect is State v. Connell, 49 Mo. 287.

On no subject has our statutory law remained un-
changed longer than this, and the decisions have been
uniform. In his plea in this case, the defendant merely
complains of the manner of impaneling a grand jury
which had been summoned and sworn and was in ses-
sion when he shot his wife. In the nature of things he
could not have been present to challenge the array or
any juror before the panel was sworn. But if he had
been present the objections embodied in his plea in
abatement and motion to quash would have availed him

naught in the face of the positive and salutary provisions of sections 2487 and 2488, Revised Statutes 1899.

III.   One, if not the most important, contention of the defendant, is that the circuit court erred in refusing to grant him continuance on his motion and affidavit in that behalf.   The said affidavit was made by W. C. Reynolds, a member of the bar and one of defendant's counsel.   The defendant himself made no affidavit.

The granting or refusal of an application for continuance, it has been uniformly held in this State, is a matter addressed to the wise discretion of the trial court, and while it is reviewable, it must appear to have been unwisely and oppressively refused before this court will interfere with the judgment of the circuit or trial court.   Various witnesses are named in the affidavit whose absence was relied upon as a ground for the continuance.   No subpoena had been issued on behalf of the defendant upon his application, or upon that of his counsel prior to the 18th day of October, 1905, the cause having been set down for hearing on the 16th of October.   As to the witness Lillie Thompson, the application is clearly insufficient.   The affidavit does not disclose when the defendant's counsel or defendant learned that the said Lillie Thompson would testify to the facts set forth in the affidavit.   She was a resident of Kansas City and the defendant and his counsel were advised that this cause was set down for October 16th, 1905, three months prior to that date.   The issuance of a subpoena two days after the cause was set for trial was no compliance whatever with the statute and showed no diligence to get her testimony.   As to the witness House, the affidavit discloses that he is a traveling showman, moving from place to place over the country, and when last heard from was in Louisville, Kentucky.   It is true the affidavit states that the said House would be in Louisville for ninety days, but the court was not informed how the affiant learned that House

would be in Louisville ninety days, or what assurance affiant had that he could procure the deposition of the said House in Louisville.  As was said in State v. Kindred, 148 Mo. l. c. 281, "Being without the jurisdiction of our courts, he might feel under no obligation to tarry there until a commission should issue and notices be served.  It was entirely problematical where or when this witness could be found."  Nor was the court informed as to the nature of the information that justified the defendant in believing that the said House would testify to the facts set up in the affidavit.  We think the affidavit was entirely insufficient as to this witness.

It is also alleged that John Parkerson will testify that he has been acquainted with defendant for thirty years, and knew him when he lived in Lawrence, Kansas, and that Parkerson will testify that about twenty-five years ago, the defendant had a severe case of typhoid fever and that after his convalescence, Parkerson had frequent opportunities of observing the conduct of the defendant, and that the defendant had spells of melancholia, and would talk incoherently.  Upon what information the affiant made these statements that Parkerson would so testify, the criminal court was not informed, nor are we.  It is further averred that Parkerson is now located at Lawrence, but the court was not informed what assurance affiant had that Parkerson could be found and his deposition taken in Lawrence on any given day.  It was not averred that he had a permanent residence there, but it was stated in the affidavit that he was a railroad man.  We think the showing as to this witness was insufficient and falls clearly within the rulings in State v. Temple, 194 Mo. l. c. 251, and State v. Kindred, 148 Mo. l. c. 281.

C. D. Atkinson is also named as another witness who would testify that five years previous to the date of the trial, he was a fireman on the Rock Island rail-

road out of El Paso, Texas; that defendant was an engineer on that train, and on one occasion, after leaving El Paso, the defendant, without any reason, left his seat on the engine box and refused to operate the engine, but sat down in the cab and refused to talk, and Atkinson was compelled to manage the engine himself; that said Atkinson now lives at El Paso, Texas; that he is a railroad man moving from place to place. As in the case of the other witnesses above mentioned, the criminal court was not given the slightest information as to when the defendant or his counsel learned that the said Atkinson would testify as above indicated, nor upon what ground affiant or the defendant was justified in believing that he would so testify. It is not even stated that the said Atkinson had written to affiant or defendant or any of the defendant's relatives that he would so testify. It is not stated that El Paso was his permanent home, nor how long he expected to reside there, but it is stated that he is a railroad man moving from place to place. And as said in the Kindred and Temple cases, being wholly without the jurisdiction of our courts, there was no assurance whatever upon which the court could act that, if the cause had been continued, said Atkinson's deposition could have been taken, nor that he would testify as stated in the affidavit.

David McGraw is also named as a material witness for the defendant, and it is stated that he now resides in Denver, Colorado, and would testify that in 1901, the defendant was an engineer on a railroad train running out of Denver, and his condition was such that it was necessary to remove defendant from the train to the hospital, and that McGraw would testify that defendant's conduct was that of an insane man and his appearance was such. The criminal court was not informed how affiant learned that McGraw would so testify, nor what reason affiant had to believe that McGraw would

so testify. It is apparent from the affidavit of affiant in regard to all the witnesses above named who were non-residents of the State, that he himself only knew them by hearsay, and as an evidence of good faith, it seems to us that affiant should have disclosed to the court what reason he had to believe that the witnesses would testify as set forth in the affidavit.

As to the witness George Moore, the affidavit shows that he lived at Lowry City, Missouri, and within the reach of a subpoena from the criminal court of Jackson county. And while the affidavit does show that affiant did not learn of the name and address of this witness until a few days prior to the 16th of October, the day on which this case was set for trial, that was no excuse for failing to send a subpoena to St. Clair county, which could have been reached readily on two lines of railway in one day, and there was ample time to have served the witness, or to have been a *non est* return. In this connection, we are reminded of the ruling of this court in State v. Worrell, 25 Mo. l. c. 256, in which it was said: "Even if the circuit court may have seemingly exercised its discretion without proper caution at first (which we do not pretend to say was the case here), yet when the whole case is presented before this court, and the absent witness, from what is alleged in the affidavit, may be supposed not to be able to change the result, if produced and present, and indeed ought not to change the result, there can be no injury done to the defendant by ruling him to trial, and in such cases this court will not reverse." So in this case, if the defendant had procured the depositions of the several witnesses as indicated in an affidavit, they would have been merely cumulative to the testimony produced on the trial in behalf of the defendant. It appears from the evidence that the defendant had resided in, this State at Kansas City, Lowry City, Harrisonville and St. Louis, and had been engaged in business at said places, and if he had exibited such evidence of aliena-

tion as indicated by the affidavit for continuance, it would appear to have been an easy matter to have found witnesses among those who had lived in the said cities in Missouri and had associated with the defendant, who could have testified to facts and circumstances tending to show his insanity, if such were in truth the fact, and the record discloses that the defendant did secure witnesses, among others, Mrs. Mary A. Logan, who lived in Kansas City, Kansas, and had known the defendant since 1866, and who had exceptional opportunity to note his conduct, as he often visited her home, and Mrs. Myrtle Logan, a daughter-in-law of the last-mentioned witness, who had known defendant for two years, and Mrs. Lillie Browning, who had known the defendant for twenty-three years, and was a sister of his second wife, and at whose house the defendant visited up to a very short time before the homicide, and Stone Browning, who had known the defendant ever since he could remember, and Cyrus C. Logan, an uncle, who had known the defendant all his life, and C. D. Crane, a brother of the defendant, and it is utterly improbable that, if the jury would not credit the testimony of these witnesses, who deposed to facts in every way as strongly indicative of insanity as anything stated in the affidavit for continuance, the depositions of these absent witnesses, whom the jury could not see and observe, would have changed the result of the trial, or overcome the clear and strong evidence of defendant's own neighbors, who resided in his neighborhood in Kansas City for the twelve months prior to the homicide. [State v. Temple, 194 Mo. l. c. 252; State v. Kindred, 148 Mo. l. c. 281.]

As to the absence of other testimony to show that Cora Freeman, an aunt of the defendant's on the mother's side, had been confined in an insane asylum, and that Enoch Logan, an uncle of the defendant was also insane, those facts were disclosed by the testimony

of three witnesses, Mrs. Mary A. Logan, Cyrus C. Logan, an uncle, and C. D. Crane, the brother of the defendant, and no effort was made by the State to contradict their evidence on this point, and the fact that these relatives had been and were insane, was incorporated in a hypothetical question upon which the experts gave their opinion. Any additional evidence on this point would have been entirely cumulative, and could not reasonably have affected the result of the trial.

Upon a careful review and analysis of this affidavit for continuance and the fact that no subpoenas were issued, we are of the opinion that the criminal court cannot be said to have unwisely and oppressively exercised its discretion in denying the continuance.

IV. It is insisted also that the court erred in refusing to enter and order a trial before said court and a jury of the question of the defendant's sanity on the day the cause was set for trial.

In State v. Church, 199 Mo. l. c. 626, this identical question came before this court. In that case, the defendant, by his attorney, filed his application alleging that the defendant was then insane and had become insane since the filing of the information and the commission of the offense, and by reason thereof was incompetent and incapable of rendering any assistance to his counsel in the conduct of the trial, and prayed the court to order a jury to decide the question as to his sanity, as provided by section 2603, Revised Statutes 1899. The court in that case heard evidence, which conclusively negatived the assertion that the defendant had become insane after the filing of the information, and the court overruled the motion and the defendant excepted, and thereupon the defendant's counsel filed another motion for an inquisition as to the sanity of the defendant and that a jury be summoned for that purpose, but did not ask that it be held in accordance with section 2603, supra. This motion also was overruled.

It was said in that case: "In criminal procedure at common law, if the question of insanity of the person upon trial is raised, it may be tried, in the discretion of the court, either by a special jury impaneled for that purpose, or by the jury who are to try the indictment; yet inspection of the accused by the judge without a jury was permissible. [2 Bishop's Crim. Proc., section 666, and authorities cited.] But under the practice in this State, if the accused is insane at the time of the commission of the offense with which he is charged, this is tried by the jury charged with the trial of the indictment or information, and in this way his insanity, if proven, is available as a defense; but if he becomes insane after he is indicted or information is preferred against him by the proper officer, and before his trial for the offense, and the court having cognizance of the case should have reason to believe that he has so become insane, this preliminary question is made the subject of statutory regulation, and it is made the duty of such court to suspend all further proceedings against such person under said charge and to order a jury to be summoned to try and decide the question of the insanity of such person, etc. Section 2604, Revised Statutes 1899, provides that 'If upon such inquiry the said jury shall become satisfied that such person has so become insane, they shall so declare in their verdict, and the court shall, by proper warrant to the sheriff, marshal, or jailer, order such person to be conveyed to the lunatic asylum and there kept until restored to reason.' Section 2605 provides that 'when such person shall be restored to reason, he shall be returned to the county whence he came . . . . and his trial had in the same manner as though no such inquiry . . . . had been made and had.' " It was accordingly held that the circuit court committed no error in overruling the said motion.

It is a familiar rule of construction that a statute

is impliedly repealed by a subsequent one revising the whole subject-matter of the first, and in case of a statute revising the common law, the implication is equally as strong. [Smith v. State, 14 Mo. l. c. 152; Bartlet v. King, 12 Mass. 537; Com. v. Cooley, 10 Pick. 37; Com. v. Marshall, 11 Pick. 350.] So here, as in State v. Church, supra, we are of the opinion that when the Legislature took this subject of the trial of insane persons in hand, it must be held that the statutory provisions on that subject are controlling, and that whatever the rule might have been at common law and in other states, our statute must govern and hence the right of a trial of the question of the insanity of a defendant in advance of the trial of the charge upon which he is indicted, only applies when such person becomes insane after his indictment, and that where his plea is that he was insane at the time of the commission of the offense, the court should not direct an independant inquiry into his sanity, but leave him to make such defense on his trial, and this conclusion is reinforced by the provisions of section 2606, which provides that, "When a person tried upon indictment for any crime or misdemeanor shall be acquitted on the sole ground that he was insane at the time of the commission of the offense charged, the fact shall be found by the jury in their verdict, and by their verdict the jury shall further find whether such person has or has not entirely and permanently recovered from such insanity; and in case the jury shall find that such person has so recovered, he shall be discharged from custody; but in case the jury shall find that he has not entirely and permanently recovered from such insanity, he shall be dealt with as provided in sections 2604 and 2605." Accordingly, it must be held that the court committed no error in overruling the motion for a preliminary trial into the sanity of the defendant.

V. It is further insisted that the court erred in refusing to quash the panel of jurors after the forty-seven jurors had been obtained, out of which the selection of the twelve who were to try the case was to be obtained, on the ground that since the empaneling and examining of the forty-seven jurors a prejudicial account of the murder and the proceedings in empaneling said jury had appeared in the Kansas City Times, a newspaper of wide circulation in and about Kansas City, which motion was by the court overruled. The decision of this court in State v. Hottman, 196 Mo. 110, is relied upon to convict the criminal court of error on this point. In that case, the counsel made the point that the jury had read the purported confession of the defendant, and the criminal court of its own motion examined each member of the panel of forty-seven as to whether or not he had read the purported confession of the defendant in the paper of that morning. Most of the panel had not seen it, or read the article, but four of them had, and answered that they had formed an opinion from reading it, and the court overruled the challenge to the array as a whole, but sustained it as to the four jurors, and discharged them from the panel and proceeded to select four others in their place. It was said in that case: "Unquestionably the defendant had the right to re-examine the jurors on the morning of the 11th of January, 1905, for the purpose of ascertaining whether anything had occured to disqualify them since their selection on the 9th of January. This he did not do, but contented himself with offering in evidence the copy of 'The Times' published that morning, containing a purported confession of the defendant, and made no request to examine the individual jurors as to whether they had read or seen the same. Obviously, those who had been tried and found indifferent between the State and the defendant, and who had not read the purported confession, were not rendered disqualified merely because the newspaper con-

tained the alleged confession;" and quoted with approval the remarks of this court in State v. Collins, 86 Mo. l. c. 248, on a similar question, wherein this court said: "We are of the opinion that this point is not well taken, inasmuch as when said jurors appeared on the 10th, defendant or his counsel, if they so desired, could have examined them to ascertain the fact whether they, or any of them, had become disqualified by anything done or said between the said two dates."

In this case the counsel contented themselves with filing a motion in the nature of a challenge of the whole array, and did not ask the privilege of examining the individual jurors to see if any of them had become disqualified, nor did they object and save any exceptions because the court did not do this for them. We think it is too late now to raise that question in this court. There is nothing to show that any of the jurors either saw or read the article of which defendant complains. While we approve the ruling of the learned judge of the criminal court in the Hottman case, we are not to be understood as requiring a trial court to make objections for a defendant and his counsel, which they do not see fit to make for themselves.

VI. Instruction numbered 5 by the court is also challenged as erroneous. That portion of the instruction which is assailed, is as follows: "If you find that the defendant was insane, and irresponsible from any disease or disorder of the mind as explained in these instructions, when he committed the homicide, then you will find him not guilty; but if you find at the time of the shooting, he was not insane, but responsible for his acts, as explained in these instructions, and that he committed the crime as charged, then you will find him guilty, even though you may believe and find from the evidence that he has become insane since the homicide and that he is now insane."

This instruction in our opinion is a correct state-

ment of the law. The question before the jury was whether the defendant was sane or insane at the time of the shooting and killing of his wife. If he was sane at that time, then the jury were required to find him guilty of murder, and that was the issue tendered by the indictment.

VII. Another ground of error has been assigned in the reply brief filed by the defendant's attorney since the argument and submission of the cause. It is now asserted that instruction number seven given by the court was erroneous. That instruction was as follows: "The testimony given by the experts and physicians, who testified in this case, is to be taken and considered by the jury like the evidence of other witnesses who testify in the case; and the opinions on questions of insanity which have been given by medical experts, are proper testimony before you, but are subject to the same rules of credit or discredit as the testimony of other witnesses, and are not conclusive on the jury. Those opinions neither establish nor tend to establish the truth of the facts upon which they are based; whether the matters testified to by the witness in the case as facts are true or false, is to be determined by the jury alone, and you must also determine whether the facts and matters stated and submitted to the experts in the hypothetical questions are true in fact and have been proven in the case."

This instruction has met the approval of this court on many occasions. It is the law that the opinions of the medical experts based upon facts do not establish, nor tend to establish the facts upon which they are based. Whether the matters testified to by the witnesses as facts are true or false is to be determined by the jury alone. It is self-evident that the opinion of the experts upon the hypothetical facts submitted to them did not and could not in the very nature of things establish the facts upon which that opinion was based.

The court in this instruction was dealing with the opinions of experts upon hypothetical questions, and it is too clear for discussion, we think, that it had no tendency to mislead the jury, but gave them a proper guide in weighing expert opinions, and in no manner depreciated the testimony of the physicians as to the facts to which they testified of their own knowledge. [State v. Duestrow, 137 Mo. 44.]

VIII. The defendant finally complains that the court permitted the State in rebuttal to prove the conduct and statements of the defendant at the time of the homicide and prior thereto, over defendant's objection. We have examined all these items of evidence, and are of the opinion that it was clearly competent for the State to prove these matters to rebut the issue of insanity, which was tendered by the defendant. As to the specific fact that some of said evidence was not in rebuttal, but a part of the State's case in chief, it is sufficient to say that the order in which the testimony was to be admitted was a matter largely within the discretion of the court and reversible error cannot be assigned upon that ground. [State v. Thornhill, 177 Mo. 691.]

In view of the serious consequences to the defendant, we have carefully gone through each and every one of these assignments of error and given them our most careful consideration, and in our opinion there was no reversible error committed by the criminal court in the trial of the cause. That the defendant was guilty of a cruel, unprovoked and deliberate murder, unless he was insane, there is not the slightest shadow of doubt in the record. Whether he was insane, and therefore not criminally responsible for his conduct in shooting to death his unoffending wife, was a question of fact for the jury, which tried the case. That issue was submitted to the jury upon instructions which were eminently fair to the defendant, and which have time and

again received the approval of this court from its earliest history. The broadest latitude was allowed the defendant in his efforts to establish his insanity, and there was testimony tending to establish his defense; on the other hand, there was ample testimony which justified the jury in reaching the conclusion that the defendant was not insane when he shot and killed his wife, and that he did know the right from the wrong of the act. Under our system of law, the jury was the tribunal charged with the trial of that question, and in the absence of any improper direction or of any testimony tending to show that they were governed by passion or prejudice, this court is not authorized to interfere with their verdict. The judgment of the criminal court is affirmed and the sentence which the law pronounces is directed to be carried into execution.

*Fox, P. J.,* and *Burgess, J.,* concur.