## THE STATE v. FINLEY, Appellant.

**Division Two, January 31, 1906.**

1. **APPEAL: Motion to Quash.** A motion to quash an informa-mation, not being a part of the record proper, must be embodied in the bill of exceptions, or else the ruling of the trial court thereon cannot be considered on appeal.

2. ———: **Information: Sufficiency.** An information is a part of the record proper, and if it shows on its face that it is invalid, the question of its sufficiency may for the first time be raised in the appellate court, whether the motion in arrest or the ruling thereon by the trial court was or was not preserved in the bill of exceptions.

3. ———: **Instructions: No Exceptions.** If no objections were made or exceptions saved at the time objectionable instructions for the State were given, they cannot be considered on appeal. Objections thereto cannot be made for the first time in the motion for a new trial.

4. ———: ———: **Upon All Law of Case.** Unless the bill of exceptions shows that defendant requested the court to instruct upon all the law of the case or in some way called its attention to its failure to do so, an assignment of error in the motion for new trial that the court erred in that respect will not be considered on appeal.

5. **ABORTION: Manslaughter: Information.** An information charging manslaughter in the first degree for killing a pregnant woman in an attempt to produce abortion is sufficient if it follows the language of the statute which describes the offense, and is otherwise sufficient in form and substance.

6. ———: **Evidence.** The evidence in this case is held sufficient to support the verdict of the jury finding defendant guilty of having administered medicines to a young woman for the sole purpose of producing an abortion.

Appeal from Pulaski Circuit Court.—*Hon. L. B. Woodside,* Judge.

**AFFIRMED.**

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1)  The information, which was properly verified, is sufficient in form and substance. It follows the language of the statute, which describes the offense. R. S. 1899, sec. 1823.  (2)  The instructions fully and fairly presented the law to the jury, and were favorable to defendant. But this court cannot consider them, as no objections were made and no exceptions were saved to the giving of instructions at the time. State v. Bayne, 88 Mo. 604; State v. Burk, 89 Mo. 635.  (3)  The alleged failure of the trial court to fully instruct upon all the law applicable to the case cannot be considered, because no exceptions were saved at the time to such alleged failure. State v. Albright, 144 Mo. 638; State v. Cantlin, 118 Mo. 111.  (4)  Defendant's counsel failed to make any offer of proof where the State's objections were sustained. By this failure, the Supreme Court cannot investigate the relevance or pertinence of said evidence. State v. Martin, 124 Mo. 514; State v. Hodges, 144 Mo. 54.  (5)  All of the evidence was admitted without objections, except in two or three instances. In each one of these, defendant simply objected without giving the reasons for his objections. This is not a compliance with our law, which requires that specific reasons for the objections shall be given, and the trial court thereby informed before a ruling is made. State v. Young, 153 Mo. 449.  (6)  The statement of this case shows that the evidence was ample to justify the verdict of guilty, and the punishment assessed is light. On the subject of the sufficiency of the evidence, this court said: "If there is substantial evidence tending to show defendant's guilt, the sufficiency of the evidence to support the verdict will not be considered by the appellate court." State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496; State v. Swisher, 186 Mo. 8; State v. Williams, 186 Mo. 128. All of the courts

hold that the acts and conduct of the defendant, and the circumstances attending the death of the woman, who has had an abortion procured, are of value in determining what connection defendant has had with the commission of the crime. Howard v. People, 185 Ill. 552. In a case where the evidence for the State was much weaker, and where there was no proof that defendant procured any medicine for deceased, a judgment of conviction was upheld. State v. Crews, 128 N. C. 581. The evidence was sufficient to show that defendant administered the medicine or drug to the deceased, according to the definition of the word "administer" as defined by all the courts. Burris v. State, 84 S. W. 723.

BURGESS, P. J.—On the 12th day of August, 1904, there was filed in the office of the clerk of the circuit court of Pulaski county, by the prosecuting attorney of said county, an information charging the defendant Finley with manslaughter in the first degree, in the killing, at said county, of one Ella Green, by administering to her certain drugs or medicine for the purpose of destroying pregnancy. At the September term, 1904, of said circuit court, the defendant was put upon his trial, found guilty, and his punishment fixed at six years' imprisonment in the penitentiary. Defendant thereafter, in due time, filed motions for new trial and in arrest, both of which were overruled, to which ruling of the court he saved his exceptions, and brings the case to this court by appeal for review.

The State's evidence tended to show that Ella Green was an unmarried woman, twenty-three years of age, and lived with her brother and stepmother on a farm in said county. Defendant lived at the same place and raised a crop on the same farm the year preceding the death of Ella Green. For three or four days prior to her death Ella Green was complaining, and claimed to her stepmother and others that she had had the measles. Her stepmother was old, very feeble and totally

blind, and did not suspect that anything of a different nature was wrong with deceased, as her brother, George, had just recovered from an attack of measles. On the 18th day of May, 1904, George Green and defendant were at work in the field, planting corn, when Mrs. Davis called defendant to come to the house, saying that Ella wanted him. This was about nine o'clock. Defendant went to the house and did not return to the field until after twelve o'clock. Between twelve and one o'clock of the same day defendant was again called by Mrs. Davis, who stated that Ella wanted to see him again. He then went to the house and into the room where the sick girl lay in bed. In a few moments Jackson Davis and William Finley, the latter a brother of defendant, drove up in a wagon and also went into the sick room. William Finley soon left the room and went to the field to get a corn planter, and about the same time Jackson Davis left the room and went to see about his team. In a short time Davis returned and found the door to the girl's room locked and that defendant was still in the room with her. Davis then went to the field and assisted in bringing the corn planter to the yard. Returning to the house, he found the door to the sick room unlocked. On entering the room he discovered that the hearth was wet, although it was dry when he was formerly in the room. Defendant stated to Davis that Ella was getting worse. At two o'clock she died. Defendant then said that the girl was dead and that there would be no more talk; that she had had the measles and had flooded to death. No physician was called to see Ella Green, and although Mrs. Davis was in the room at the time she died, the defendant did not tell her that Ella was dead, nor did the old lady know it until some others came in and told her. Defendant started to wash and dress deceased, but one of the men present suggested that they had better get some of the neighbor women to do this, to which defendant objected, saying they would do it. Some women were sent for, and they came in the

course of an hour or two. They said deceased had suf-
fered from a miscarriage. The bed clothes were bloody,
and a piece of oil cloth and two aprons were under the
body. One woman testified that "everything around
went to show that she had been confined;" another said
that when she got there deceased was almost naked, and
"was lying in a gore of blood." These witnesses dis-
covered that the bed clothes were in a tub of water; that
the water was red with blood and that there were two
pieces of flesh in the tub. It was suggested that a post-
mortem examination be held, to which defendant object-
ed, and kept on insisting that deceased died as a result
of flooding. He wanted deceased's brother, George
Green, to kick the coroner out of the house when he came.
Defendant voluntarily said to Mrs. Salsman that even-
ing that he could tell what killed Ella, and that "she had
flooded to death on acount of the measles." Some time
prior to the death of deceased the defendant went to
see Dr. Trice and told him that the widow Davis had
sent him to get some medicine for Ella Green, and that
Ella had become a little irregular in her monthly sick-
ness. He also went to Dr. Reagan and told him prac-
tically the same thing, and he procured medicine from
both physicians. In March, prior to the death of Ella
Green, defendant went to a drugstore in Richland, and
told a physician therein, Dr. Harmon, that Ella Green
had missed her monthly, and wanted some medicine to
make her regular. The druggist rather hesitated about
furnishing this medicine, remarking that he would not
have an abortion produced for a thousand dollars. On
May 7th, following, defendant again visited the drug-
store and told the druggist that the medicine he had
gotten there did not do what she wanted, and that Ella
Green requested him to get some more. The medicine
was again furnished defendant, paid for and taken away
by him. These prescriptions contained ergot, cotton
root and buchu, and one bottle was found in her room
after deceased's death. The physicians testified that

the medicine thus obtained by defendant would produce an abortion. Dr. Oliver testified that he, as coroner, held the post-mortem examination over the body of deceased the day after her death, and found that she had miscarried, but discovered no signs of measles or other skin disease. He gave it as his opinion that she had advanced seven months in pregnancy. Four days after the death of deceased the defendant met one John Johnson and told him that he (defendant) was in hot water, and was being accused of killing Ella Green. About two weeks afterwards he again met Johnson, and said that they had not hung him (defendant) yet, but that if he had justice he would be hung. A few days before the death, defendant, in speaking of deceased, told Charles Briggs that she had measles, and was broken out all over, but that they would not hurt her. This witness went to the Davis home the day on which the death occurred, saw defendant washing his hands, and asked if Ella was dead, to which defendant replied that she was. When defendant and witness were alone in the room where the deceased lay in an almost nude condition, witness said to defendant, "I thought you told me Ella had the measles; there is no sign of measles here." Defendant replied, "They have been lying about her; she is not in the family way, is she?" To this witness replied, "No, not now." A few days before, the deceased said to witness, in the presence of defendant, that she had never had measles, but had been where people did have them, and never caught them. After she left, defendant said to witness that he did not think the girl was in the family way.

On the part of the defendant, the evidence showed that he lived on and cultivated a part of the Davis farm, and that he had associated some with the deceased. He admitted procuring the two bottles of medicine from Dr. Harmon, and said that he did so at the request of deceased. Defendant said he brought the medicine to the deceased, but denied administering any

State v. Finley.

of it to her.. He admitted being at the house and in the room when deceased died, but denied that the door was ever locked, and said he did not know whether the hearth was wet or dry. He also admitted talking to some of those present about washing and dressing deceased, but that when some one suggested that he had better have some woman do that, he (defendant) went for some women in order to have them do so. Dr. Harmon testified that he gave defendant the two prescriptions referred to, for the purpose of making Ella Green regular in her periods; that the medicine would have produced an abortion if it was true that deceased was seven months in pregnancy; that when defendant told him that the girl had missed her monthly, he asked if there was anything wrong with her, and defendant replied that he had known her ever since she was small and that she was a nice girl; that defendant further said, if he thought the medicine was to be used to produce an abortion, he would not take it to her.

The court instructed the jury, in behalf of the State, as follows:

"1. The court instructs the jury that if you believe and find from the evidence that the defendant, in Pulaski county, Missouri, and on or about the 18th day of May, 1904, did willfully and feloniously administer to one Ella Green a certain medicine, drug and substance for the purpose of destroying the pregnancy of the said Ella Green, and if said medicine was so administered without intending necessary medical or surgical treatment, and without intending any other injury than the destroying of pregnancy, and if the said medicine so administered by defendant to the said Ella Green, did at the time and place aforesaid kill the said Ella Green, you will find the defendant guilty of manslaughter in the first degree and assess his punishment at imprisonment in the State penitentiary for a term not less than five years.

"2. The term 'willfully,' as used in these instruc-

tions, means intentionally and not by accident. The term 'feloniously,' means wickedly and against the admonition of the law; that is, wickedly and unlawfully.

"3. The defendant is a competent witness in his own behalf and his testimony should be considered by you in making up your verdict, but in determining what weight you will give to his testimony you may consider the fact that he is the defendant and on trial.

"4. You should consider all statements shown to have been made by the defendant with caution, on account of the fact of the liability of the witnesses to forget or misunderstand what was really said or intended.

"5. The court instructs the jury that the word 'administered,' as used in these instructions, means the giving to the deceased any drug or substance in any quantity whatever for the purpose of producing an abortion."

At the instance of defendant the court gave the following instructions:

"1. In order to convict it devolves upon the State to show and prove beyond a reasonable doubt: That on or about the time charged in the information Ella Green was a pregnant woman, and that the defendant in Pulaski county administered to her medicine for the purpose of destroying such pregnancy, and that he administered such medicine without intending any other injury than the destruction of such pregnancy and without intending any necessary medical treatment; and unless the State has proven these facts the defendant should be acquitted, and while they may be proven by circumstances, yet when the State seeks to establish any fact by circumstances, the circumstances must be consistent in themselves and with each other and wholly inconsistent with the innocence of the accused. And in this case, if the circumstances introduced in evidence can be explained upon any other reasonable theory than that of defendant's guilt, you should find him not guilty.

193 Sup—14

"2. The court instructs the jury that the law presumes the defendant to be innocent, and this presumption remains until the State, by evidence, establishes his guilt to your satisfaction and beyond a reasonable doubt; if, therefore, upon a full consideration of all the evidence, you have a reasonable doubt of defendant's guilt, you should give him the benefit of such doubt and acquit him; but to authorize an acquittal on the ground of doubt alone it should be a reasonable doubt and not a mere possibility of his innocence."

The defendant is not represented in this court, but in his motion for a new trial he assigned the following as reasons why the verdict should be set aside and a new trial granted:

"1. Because the court admitted illegal testimony on the part of the State and excluded competent and legal testimony on the part of the defendant in the trial of the cause.

"2. Because the court misdirected the jury in giving instructions on the part of the State which did not properly submit the cause to the jury and failing to properly instruct the jury on part of the defendant in material matters of law.

"3. Because the verdict is contrary to the law and the evidence.

"4. Because the court erred in overruling the defendant's motion to dismiss the cause at the close of State's testimony.

"5. Because the verdict is not supported by the evidence.

"6. Because the court failed to instruct the jury on all the law in the case."

In the motion in arrest of judgment a point is made upon the sufficiency of the information, which is claimed to be invalid for the reasons specified in that motion. But neither the motion nor the ruling upon it is embraced in the bill of exceptions, and being matter of exception, could only be preserved that way. In a long

line of decisions by this court it has been held that a motion to quash an indictment, not being part of the record proper, must be embodied in a bill of exceptions. [State v. Gee, 79 Mo. 313; State v. Thruston, 83 Mo. 271; State v. Henderson, 109 Mo. 292; State v. Fraker, 137 Mo. 258.] The same rule applies to a motion to quash an information. The action of the court upon the motion to quash cannot, therefore, be considered by this court. [State v. Fraker, supra.] If, however, the information, which is a part of the record proper, shows upon its face that it is invalid, that question may be raised for the first time in this court, but nothing appears upon its face which in any way renders it invalid. It is sufficient in form and substance, and follows the language of the statute which describes the offense. [Sec. 1823, R. S. 1899.]

The evidence was all admitted without objection, save in two instances, and in these the objections were general, no grounds therefor being stated. Unless, therefore, the evidence was not admissible for any purpose, no error was committed in admitting it, and we are not prepared to say that it was not admissible for the purposes for which it was offered.

The instructions fully and fairly presented the law of the case to the jury. But even though the instructions were objectionable, this court could not consider them, no objection having been made or exception saved at the time, and this could not be done for the first time in the motion for a new trial. [State v. Bayne, 88 Mo. 604; State v. Burk, 89 Mo. 635, and authorities cited.]

The sixth ground of objection assigned in the motion for a new trial is the alleged failure of the court to instruct the jury upon all the law of the case. But it does not appear from the bill of exceptions that the defendant at any time requested the court to instruct upon all the law of the case, or that its attention was called to its failure to do so by the defendant, and the objection could not be raised for the first time in the motion for

new trial. [State v. Cantlin, 118 Mo. 111; State v. Albright, 144 Mo. 638.]

As to the assertion in the motion for a new trial that the verdict is not supported by the evidence, it is scarcely necessary to say more than that the facts heretofore stated make a strong case against the defendant and point to his connection with and responsibility for the death of Ella Green. That he was responsible for her ruin and disgrace, in the first place, and that then, in order to hide her shame, he procured, by false statements and representations, the medicine which she took for the purpose of procuring an abortion, which abortion resulted in her death, there can be no question. And what, if possible, is worse still, and which shows the defendant to be destitute of the common feelings which stir humanity, is that when the girl called for him and he went into her room, where she was lying in the shadow of death, he locked the door behind him and let her die without notifying her aged stepmother, who was blind, and who did not learn of her daughter's death until informed of the fact by other persons.

Defendant's actions at the time of the girl's death, his protesting against a post-mortem examination, his frequent voluntary assertions that she was not pregnant, but that she had died of the measles, when there was no evidence whatever that she had had such disease, tend strongly to show his consciousness of guilt; and these facts, taken in connection with all the other facts and circumstances adduced in evidence, prove his guilt beyond any question. The judgment should be affirmed. It is so ordered.

All concur.