THE STATE v. GEORGE GLASSCOCK, Appellant.

Division Two, February 7, 1911.

1. **INDICTMENT: Defects: How Raised.** Defects appearing on the face of an indictment may be raised by a demurrer; but irregularities in the impaneling of the grand jury and in qualifying its members, are not matters of demurrer, but should be raised by a plea in abatement, motion to quash, etc., and by evidence in support thereof.

2. **PLEA IN ABATEMENT: Grand Jury: Challenge.** Challenges of a grand jury and of its members are of two kinds, namely, challenge to the array, and challenge to the polls. Challenge to the array is for some imperfection in the constitution of the panel; and a challenge to the polls is for some disqualification of a juror. But under the statute neither is available unless made before the jury is sworn.

3. ———: **Motion to Quash: Preserved for Review.** A plea in abatement and a motion to quash the indictment are matters of exception, and can be preserved for review on appeal only by being made a part of the bill of exceptions. So that a challenge to the grand jury, whether to the array or because of the disqualification of its members, made by a plea in abatement and by a motion to quash, will not avail defendant on appeal and cannot be considered, unless the plea and motion are preserved in the bill.

4. **EVIDENCE: Murder: Consciousness of Guilt: Unnatural Conduct.** Where deceased had been mysteriously shot on his own premises in a pasture near his garden about eleven o'clock on Sunday in summer, and the news spread rapidly and within an hour a hundred people had assembled at the scene of the crime, coming in vehicles and on horses, many of them along the public road near defendant's house, which was only a quarter of a mile away, testimony that defendant did not go to the home of deceased, whose family consisted of a wife

State v. Glasscock.

and two small children, that in the afternoon he rode to his pasture in the opposite direction, that he did not attend deceased's funeral and did not go near his home until compelled by subpoena to attend the inquest, was competent evidence as tending to show his consciousness of guilt, although the State had previously shown that ill-will existed between the men.

5. ———: ———: ———: Alibi: **Contradictory Evidence by State.** Although the State's witnesses located defendant at a certain place on the morning of the homicide, it was not incompetent to permit the State to show by other witnesses that defendant had made statements to the effect that he was at another place at that time. Whether or not the testimony of the first witnesses furnished a sufficient basis for the defense of alibi, the State had the undoubted right to prove by them or other witnesses that defendant made false statements as to his whereabouts, as a circumstance tending to prove his consciousness of guilt.

6. ———: **No Objection.** Unless an objection is made to testimony offered by the State at the time it is offered, the ruling of the court admitting it will not be considered on appeal.

7. **INSTRUCTION: ALIBI.** An instruction on the subject of alibi which tells the jury that "the defendant is not required to establish this defense beyond a reasonable doubt, but if from the whole evidence you have a reasonable doubt of defendant's presence at the commission of the alleged offense, you must give him the benefit of that doubt and acquit him," fairly and correctly states the law; and though defendant offers no evidence to establish an alibi, yet if the State introduces testimony tending to prove that defendant made contradictory statements as to his whereabouts at the time the crime was committed, the purpose being to show the defendant's consciousness of guilt, as a circumstance in the case, it is not error to give an instruction on the subject of alibi where the one asked by defendant was refused.

Appeal from Ray Circuit Court.—*Hon. F. H. Trimble,* Judge.

AFFIRMED.

*Jas. L. Farris, Jr., J. D. Allen* and *Lavelock & Kirkpatrick* for appellant.

(1) The vacation order of the judge of the circuit court, convening a grand jury for the October

term, 1909, that being the term at which the defendant was indicted, was not made and filed as the law directs; the order for the grand jury was not filed by said judge, but by the prosecuting attorney. This was neither a literal nor a substantial compliance with the mandate of the statutes. R. S. 1909, sec. 7266. (2) The record does not disclose that the body which preferred the indictment against the defendant was legally impaneled as a grand jury; the names of the individuals set out in the special venire do not correspond with the names of the individuals composing the body that returned the indictment; the names differ and the individuals are not in any way identified. Some of the veniremen were sworn while others affirmed, but it was made to appear that any one was entitled to qualify as a grand juror without taking the required oath; under certain circumstances a grand juror may qualify as such by affirming, but in order to do so it must be made to appear that he was entitled to qualify by affirmation instead of by oath. R. S. 1909, sec. 6348; Rapalje's Crim. Proc., sec. 68; State v. Rockafellow, 6 N. J. L. 405; State v. Harris, 7 N. J. L. 361; State v. Fox, 7 N. J. L. 244; State v. Harris, 7 N. J. L. 432; State v Fox, 9 N. J. L. 305. (3)    The record recites that "said grand jurors were duly instructed, charged and sworn, except Michael P. Holler, who duly affirms as provided in section 2489 of the Revised Statutes of the State of Missouri for the year 1899," but this section does not authorize the qualification of a grand juror by affirmation. (4)    The indictment returned recites that "the grand jurors on their oaths present," etc., but the record affirmatively shows that all the grand jurors were not sworn, one having affirmed. The indictment therefore does not recite the facts. If some of the grand jurors qualify by oath and others by affirmation, this fact should be shown by the indictment. 9 Car. & P. 78. (5)    The return

of. the sheriff on the venire was not copied into the court record, nor does the record show that the grand jury was selected from the individuals summoned by the sheriff, and under such circumstances there is no presumption as to the regularity of the proceedings in selecting and impaneling the grand jury. Connor v. State, 4 Yerg. (Tenn.) 137. It therefore appears that the grand jury was not legally impaneled and sworn, and therefore the charge preferred against the defendant could not constitute in law a valid indictment against him, and the overruling of his objections thereto constituted reversible error.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State; *Maurice G. Roberts* of counsel.

(1) It is intimated that the indictment cannot be upheld, that the whole proceeding must fail, because, it is alleged, the record does not show that the grand jury which returned the indictment was "impaneled." The word "impanel" simply means the "making of a list of those who have been selected." Zapf v. State, 35 Fla. 210; Porter v. People, 7 How. Prac. 443; State v. Potter, 18 Conn. 175; Rich v. State, 1 Tex. App. 209; Lyman v. People, 7 Ill. App. 348. This record refutes the contention made as above mentioned. Besides, any question of this sort must be raised before verdict. State v. Smallwood, 68 Mo. 194; State v. Clifton, 73 Mo. 430. And neither the plea in abatement nor the motion to quash can be considered as raising this or any other question since they are not incorporated in the bill of exceptions. State v. McKay, 225 Mo. 544; State v. Little, 228 Mo. 295. Further, the contention is not tenable under our statute, in any event, since no such challenge is permissible in any case. State v. Reed, 162 Mo. 316. This contention is nearly in the class with those made in State

v. Armstrong, 167 Mo. 267; State v. Orrick, 106 Mo. 118. (2) The motion to quash cannot be considered since it was not incorporated in the bill of exceptions. State v. McKay, 225 Mo. 544. Besides, the motion to quash was nothing more than a challenge to the array, and was neither in time nor for any cause recognized by our statute. R. S. 1909, secs. 5067, 5068; State v. Hudspeth, 150 Mo. 21; State v. Crane, 202 Mo. 73. (3) The plea in abatement is not set out in the bill of exceptions and cannot be considered. State v. Little, 228 Mo. 295. Further, the suggestions next above, with reference to the motion to quash, are equally applicable to the plea of abatement. (4) The bill of exceptions not containing either the motion to quash or the plea in abatement, there is nothing in this court to show that any point was made below on the summoning of the grand jury. It is necessary to raise these questions in the trial court. State v. Moore, 156 Mo. 142; State v. Pate, 67 Mo. 490. Further, even if the point had been properly preserved for review, it would have to be ruled against appellant. State v. Griffin, 87 Mo. 612. (5) Measured by the standard fixed by this court, there is an abundance of evidence to support the verdict. State v. Glahn, 97 Mo. 689; State v. Rumfelt, 228 Mo. 451; Dean v. Com., 32 Gratt. 923; State v. McGee, 188 Mo. 409; State v. Long, 209 Mo. 388; State v. Sharpless, 212 Mo. 207; State v. Page, 212 Mo. 242.

KENNISH, P. J.—On the 3d day of November, 1909, the grand jury of Ray county returned an indictment charging George Glasscock with the crime of murder in the first degree. The indictment was in three counts, in each of which, in slightly varying language, the defendant was charged with shooting with a rifle and killing Clyde Hatfield on the 13th day of June, 1909. A demurrer, plea in abatement and

motion to quash the indictment were each in turn filed
and overruled. The State elected to prosecute for
murder in the second degree. The accused was ar-
raigned, entered his plea of not guilty and was put
upon his trial, which resulted in a verdict of guilty,
the punishment assessed being a term of fifteen years
in the penitentiary. Timely motions for new trial
and in arrest of judgment were filed and overruled,
sentence was pronounced in conformity with the ver-
dict, and an appeal was taken to this court.

The evidence for the State tended to show that
during the summer of 1909 Clyde Hatfield was living
upon and cultivating a portion of appellant's farm.
Bad blood seems to have arisen between the two men.
About ten days before the killing, appellant, explain-
ing the purchase of a new rifle, said he wanted to get
rid of Hatfield; that Hatfield had stolen about forty
of his chickens; that he got the rifle to "shoot people
off the place and kill some stray dogs." To another
witness, a few days before Hatfield was killed, ap-
pellant said that Hatfield and Vanbebber were steal-
ing his chickens and that Hatfield had to get off his
place or he would get him off. He added that he had
a Winchester that would kill a man a half mile away,
exhibited one pistol and declared he had another con-
cealed on his person. To another witness appellant
said on June 9, 1909, that three of his steers had been
shot and he believed Hatfield did it; that he thought
Hatfield had taken some of his chickens; that he had
shot one Hatfield and he died afterwards. On the
next day he made like accusations against Hatfield,
inquired for him and said he was hunting him. On
the same day appellant said to another witness: "I
am on the track of my man and can get him. The
thing I want to find out is who loaned the gun. There
is a certain class of people in this neighborhood you
can't reach by law; all the way you can reach them is

with a gun from the brush and let them find it out; that's the way to do it." To another witness appellant said he thought he knew who shot his steers, and added: "I think he has gone to the Springs to see one of his aunts, the party that I think done it. I aim to get the s—n of a b—h when he comes back." It appeared from the testimony of other witnesses that Hatfield had been in Excelsior Springs that week.

The night before he was killed, Hatfield and his family, which included his wife and two small children, stayed at the home of his mother, Mrs. Ida Hatfield, about five miles from the house in which he was living on appellant's farm. He had arranged to move away from appellant's farm on the following Monday. About nine o'clock on Sunday morning, June 13, 1909, Hatfield, his wife and children, his sister, a Mrs. Kauffman, and Dave Petty, started from Mrs. Ida Hatfield's home to the home of the deceased on the Glasscock farm. In making the trip they passed appellant's house, which stands near the public road. From this point they went west, thence south and thence east to the Hatfield home. The distance around the road from appellant's house to the Hatfield home is about three-quarters of a mile, but in a direct line through the field the distance is almost exactly a quarter of a mile. Petty having turned off and gone to his own home, the other members of the party reached the Hatfield home about nine-thirty o'clock in the forenoon. Hatfield harnessed a horse for his sister, who proceeded to her own home. He then carried some wood into the house, kindled a fire, and shortly before eleven o'clock a. m. started to a guinea's nest southeast of the house, leaving his wife in the garden, where she busied herself with getting vegetables for dinner.

In the meantime, a little after ten o'clock a. m., a neighbor named Fields went to his mail box, which

stood in the road west of appellant's residence, and in the field between the homes of appellant and Hatfield saw appellant some three hundred and fifty yards away, walking southward toward the Wilkerson pasture, which lies south of and adjacent to the Hatfield cornfield and garden. Fields testified that appellant had something in his hand which looked like a gun. He said in his testimony that he would not swear that it was a gun, but "it looked to be a gun." Fields had also seen appellant a few minutes before at a point north of where he saw him the second time. Each time he was, seen by Fields appellant was walking in a southerly direction. The second time the witness saw him, appellant was "down in the hollow."

After leaving his wife in the garden, as above stated, Hatfield went southeast into the Wilkerson pasture. Shortly thereafter, and at about eleven o'clock a. m., Mrs. Hatfield heard the report of a gun close at hand. She arose from the ground, where she was sitting beside a lettuce bed, and called her husband, but received no reply. He was not in sight, though he could have been seen by her if he had been standing. Thereupon, she hastened to the Barnett home, about a quarter of a mile northwest of the Hatfield home. Barnett returned to the Hatfield home with her and they went into the pasture which Hatfield had entered just before the firing of the shot. At a point in this pasture about thirty feet south of the garden fence and two hundred feet from the house, they found the dead body of Clyde Hatfield, lying face downward in a pool of blood. The head was to the southwest.

An examination of the body indicated, according to the witnesses for the State, that a bullet had entered the body on the left side of the breast, near the shoulder or arm-pit, and had passed out on the right side of the breast, inflicting a wound that caused instant

death. The clothing was driven into the wound on the left side.

There was no evidence of a struggle and no tracks were found near the body, except those made by Barnett and Mrs. Hatfield after the shooting, nor was there any indication that robbery had been the motive for the killing. No weapon was found, neither was the bullet found, although search was made for it.

The body was found in a "little open place which was surrounded by brush and timber." Behind a bush about forty feet northeast of the point where the body was found, several imprints of a portion of a man's foot were discovered. These imprints were found on the east side of the bush. The bush was between the the imprints and the house, and the limbs of the bush, on the east side, were bruised and scorched.

It further appeared that a man could make his way from the point where appellant was seen by Fields, to the bush behind which the tracks were found, without exposing himself to the view of persons at the Hatfield house. Along the fence on the south side of the cornfield, footprints were found leading in the direction of the Hatfield home. These footprints were large, as were those near the bush.

After the finding of the body the whole countryside flocked to the Hatfield home. Appellant, though living but a quarter of a mile away, did not go to the Hatfield home until that night, when he went in obedience to a subpoena to attend the inquest. Many of the people who were at the Hatfield home in the afternoon must necessarily have passed appellant's house in going to the Hatfield home. It also appeared that appellant did not attend the funeral.

Appellant's sister-in-law, who was visiting at his home on the day of the killing, testified that she, appellant and appellant's wife were the only persons at appellant's home on that day; that they had break-

fast about five o'clock a. m., and that about nine o'clock a. m., she retired to an upstairs room; that about eleven o'clock a. m., or a little later, appellant's wife came into the room; that after a short conversation with appellant's wife, witness went down stairs and saw appellant there, dressed, except as to his coat and shoes. At about 12:15 o'clock p. m., other witnesses, driving through the field from appellant's place to Hatfield's, saw appellant in his field about a hundred and fifty or two hundred yards south of his house.

In the afternoon while appellant was riding east along the road which passed his house, he was asked by a witness if he had heard of the shooting of Clyde Hatfield. He replied that it was a surprise to him and said that was the first he had heard of it. In the same conversation appellant said he had seen Hatfield that morning. To another witness, appellant said he had first heard of Hatfield's death when he was getting ready to go to salt his cattle at the Ray farm. About a week after the killing, appellant stated to a witness that he went to bed about eight o'clock on the morning Hatfield was killed and did not get up until one-thirty o'clock that afternoon. In August, 1909, appellant had a sale of his personal property.

In a conversation with a witness, in the latter part of August, 1909, appellant, commenting upon the testimony given by Mrs. Hatfield at the preliminary examination, said that she fell down when she said that the shot came from the north; that it didn't come from that direction. In the same conversation, appellant also stated that Clyde Hatfield had stolen chickens from him and that Gus Vanbebber had hauled them off; that Clyde Hatfield was a G—d d—d s—n of a b—h and the community was better off without him; that if he did kill him, they couldn't prove it. Speaking of Vanbebber, he said he would get that other

s—n of a b—h.   To another witness, speaking of Sam
Fields, who had testified at the preliminary examina-
tion, appellant said he thought Fields would run off;
that Fields knew he was under a death sentence if he
testified to what he did at the other trial.

The evidence introduced on behalf of the appel-
lant tended to show the following facts:

That the entrance of the bullet was on the right
side of Hatfield's body and the exit on the left side.
That on the day Hatfield was killed there was no fence
in the field south of the Glasscock house, at the point
where Fields testified he saw Glasscock, as stated by
Fields in his testimony. That there had previously
been a fence there, but it had been removed before
the date of the killing of Hatfield.   That by reason of
brush along the road, at the point from which Fields
testified he observed appellant going south through the
pasture, the view was so obstructed that it would have
been difficult to have seen a man at the place designated
by Fields.   That at the Hatfield home, on the after-
noon of the killing, a witness named Hyder, address-
ing several men in a general way, asked: "Did any
one see George Glasscock to-day, coming here or going
away from here?"   That in response to that inquiry,
the witness Fields said: "If any one did, no one has
heard of it."   That the testimony given by Mrs. Hat-
field at the trial, in which she testified that the report
of the shot came from the south, was contradicted by
her testimony given at the preliminary examination,
where she testified that the report came from the north.
That after Mrs. Hatfield had testified at the prelim-
inary examination, the prosecuting attorney, in his
argument, in the presence and hearing of Mrs. Hat-
field, stated that she had made a mistake as to the
direction from which the sound of the shot came.

It was also shown that at the time the appellant
was said by the witnesses for the State to have stated

that Hatfield was at ''The Springs'' and that he would get him when he came back, appellant knew that Hatfield had returned from his visit at Excelsior Springs. That after Hatfield returned from Excelsior Springs, and only a day or two before the date of the alleged statement and threat, appellant, in company with several men, had seen Hatfield and had spoken to him at the town of Georgeville. Neither appellant nor his wife testified as witnesses in the case.

In rebuttal, the State introduced evidence in support of the reputation of the witness Fields for truth and veracity, also evidence contradicting that which had been introduced by the defendant to contradict Fields, and also some further testimony to show that the entrance of the bullet was on the left side of Hatfield's body. This was the substance of all the evidence.

I. Appellant first assigns as error the action of the court in overruling the demurrer to the indictment. The demurrer is general and alleges but the one ground that the indictment does not charge the commission of any offense under the laws of Missouri.

The indictment contains three counts and each count charges the offense in accordance with precedents which have received the approval of this court, and the demurrer was properly overruled. [State v. Hudspeth, 150 Mo. 12; State v. Gray, 172 Mo. 430; State v. Bailey, 190 Mo. 257; State v. Heath, 221 Mo. 565; Kelley, Crim. Law and Prac., sec. 474.] Indeed, as we understand appellant's assault upon the indictment, it is not because of defects appearing upon its face and therefore properly raised by demurrer, but because of irregularities in the impaneling of the grand jury and in the qualifications of its members; questions which are raised in this record, if at all, by the

plea in abatement, motion to quash, and the evidence introduced in support thereof.

II.   The defendant filed a plea in abatement, also a motion to quash the indictment, both of which assail the indictment upon the same grounds, namely, because the statutory requirements in the ordering and impaneling of the grand jury were not complied with, and also because of the failure of one or more of the members thereof to properly qualify to serve on that body. This contention, so strongly urged by distinguished counsel for appellant, is wholly without merit.

Challenges of a grand jury or of its members are of two kinds: to the array and to the polls.   The law upon the subject of the right of challenge in the case of a grand jury is stated in Bishop's New Criminal Procedure (4 Ed.), section 876, as follows: *"To the array—to the polls.*—The challenge is either. The former is for some imperfection in the constitution of the panel; the latter, for some disqualification of a juror."

Section 5067, Revised Statutes 1909, provides: "Any person held to answer a criminal charge may object to the competency of anyone summoned to serve as a grand juror, before he is sworn, on the ground that he is the prosecutor or complainant upon any charge against such person, or that he is a witness on the part of the prosecutor and has been summoned or bound in a recognizance as such; and if such objection be established, the person so challenged shall be set aside."

Section 5068 provides: "No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other cases than such as are specified in the last section."

It is disclosed by the plea in abatement, the motion to quash, and the evidence offered in support thereof, that no objection was made to any member

of the panel before the jury was sworn, upon either of the grounds enumerated in the first of the above sections, or upon any other ground, and a challenge upon a ground not authorized in the first section, either to the array or to the polls, is expressly prohibited by the second section.

Discussing the intention of the Legislature in the enactment of the foregoing statutes, this court, more than fifty years ago, in the case of State v. Bleekley, 18 Mo. l. c. 431, said: "They supposed all objection to juries, either grand or petit, must, under the laws of the State, be made at the time when about to be sworn, and for the causes in the statutes mentioned. . . . The defendant is not permitted to question the manner of summoning the grand jury; such a cause on such a subject, is not one of the statutory objections allowed to grand juries or to a grand juror in our courts, and none other can avail." [See, also, State v. Crane, 202 Mo. 54; State v. Sartino, 216 Mo. 408.]

But even if the objections made against the grand jury and its members in the plea in abatement and the motion to quash were well founded and meritorious in the trial court, they could not be of avail to the defendant in this court for the reason that the plea and motion, which are matters of exception, are not preserved in the bill of exceptions and, therefore, are not before this court for review. The plea in abatement and the motion to quash are found in the record proper, but are not included in the bill of exceptions. The evidence in support of each and the rulings of the court thereon are preserved in the bill of exceptions, but that is not enough, for the plea and motion have no place in the record proper, and it is as essential that they be incorporated in the bill of exceptions as in the case of motions for a new trial and in arrest of judgment. [State v. Little, 228 Mo. 273; State v.

Earll, 225 Mo. 537; State v. Finley, 193 Mo. 202; State
v. Hicks, 160 Mo. 468; State v. Wear, 145 Mo. 162.]

III.   The evidence for the State tended to show
that Clyde Hatfield was murdered about eleven o'clock
on Sunday morning.   The news soon spread through
the neighborhood and within an hour a hundred peo-
ple had assembled at the scene of the crime.   They
came on horseback and in vehicles, many of them pass-
ing on the public road near the defendant's home.
The defendant did not go to the Hatfield home, al-
though he lived but a quarter of a mile distant.   In
the afternoon he rode to his pasture in the other di-
rection.   He did not attend Hatfield's funeral, nor did
he go near the home of the deceased until compelled
to attend the inquest under subpoena.

Appellant contends that the court committed error
in admitting, over the defendant's objection, evidence
tending to prove the foregoing facts.   In support of
this alleged error, appellant calls attention to the fact
that the State had offered evidence to show the exist-
ence of ill-will between the appellant and the deceased,
and appellant says: "Granting it to be true, then it
would not be expected that, upon the death of Clyde
Hatfield, Glasscock should go over there and pretend
profound sorrow; to have done so would have been a
badge of suspicion."

The conduct of the accused after the crime, and
his failure to go to the Hatfield home along with his
neighbors even after he knew of the homicide, was
competent evidence tending to prove a consciousness
of guilt, and the court did not err in overruling the
defendant's objections to such testimony.

The theory upon which such evidence is admissible
is that consciousness of guilt is generally indicated
by the unnatural acts and conduct of the guilty after
the commission of the crime.   And while failing to go

to the place of the crime, as the neighbors did, was unnatural and a circumstance tending to prove the guilt of the defendant, yet if he had been upon the ground promptly and, notwithstanding the pre-existing ill-will, had "professed profound sorrow," his conduct might have been equally unnatural and entirely competent for the consideration of the jury in determining the question of his guilt or innocence. Regardless of the relations between the defendant and the deceased, while the latter was living, when it became known that the deceased had been murdered on the defendant's farm, in the daytime, leaving a widow and two young children, defendant's conduct, in the light of human experience, is not easily explained on the theory of the ill-will which must have ended, at least so far as deceased was concerned, with his death. Neither is it probable that an innocent neighbor would, under such tragic circumstances, stop to speculate as to whether his conduct in going to the scene of the crime and rendering such assistance as was in his power, in caring for the dead or in apprehending the criminal, would be a "badge of suspicion." In any event, if the evidence of the ill-will existing between the defendant and the deceased was a satisfactory explanation of the defendant's conduct, the latter was given the full benefit of it, and it was a question for the jury to consider with the other circumstances of the case.

Witnesses Fields and Swofford testified in behalf of the State as to where the defendant was at certain times on the morning of the day of the homicide. Another witness for the State testified as to statements made by the defendant to the effect that he was not at the places mentioned as testified to by the witnesses Fields and Swofford. Upon this state of facts, appellant contends, as we understand it, that as the State had located the defendant by the testimony of the witnesses named, it was not competent for the State to

prove statements and declarations made by the defendant contradictory of the testimony of said witnesses. Whether the testimony of the witnesses for the State furnished a sufficient basis for the defense of *alibi* or not, the State had the undoubted right to prove that the defendant made false statements as to his whereabouts at the time of the homicide, as a circumstance in the case tending to prove consciousness of guilt. The principle of law applicable in such cases is stated as follows: "The fact of the utterance of falsehoods by the accused to exculpate himself, the falsehoods being satisfactorily proved, is relevant to show a consciousness of guilt." [12 Cyc. 398; State v. White, 189 Mo. l. c. 351.]

IV. Eleven witnesses for the State testified to threats of the most incriminatory character made by the defendant against the deceased shortly before the murder, also evidence as to profane and vile epithets spoken by the defendant of the deceased, even after the latter's death.

It is stated in appellant's brief that this evidence was admitted "over the objections of the defendant." We have examined the testimony of each of the witnesses named, and have failed to find that any objection was made to the admission of such testimony. Therefore, the point now made as to the admissibility of such testimony is not before this court for review and we shall not notice it further or the argument of the appellant thereon, except to state that we think this testimony was not only competent, but that it supplied the most cogent proof of the motive for the crime.

V. On the question of *alibi* the court, of its own motion, gave the following instruction:

"One of the defenses interposed by the defendant in this case is what is known as an *alibi;* that is, that defendant was not present at the time and place of the

alleged offense, but was elsewhere. If you find from the evidence in the case that the defendant was elsewhere than at the place of the alleged offense, then you should find the defendant not guilty. The defendant is not required to establish this defense beyond a reasonable doubt, but if from the whole evidence you have a resonable doubt of the defendant's presence at the commission of the alleged offense, you must give him the benefit of that doubt and acquit him.''.

Appellant complains of error in the giving of the foregoing instruction, not because an instruction on the subject of *alibi* was given by the court, for the defendant had requested such an instruction, but because the jury are instructed that ''the defendant is not required to establish this defense beyond a reasonable doubt, but if from the whole evidence you have a reasonable doubt of the defendant's presence at the commission of the alleged offense, you must give him the benefit of that doubt and acquit him.''

The instruction fairly and correctly states the law upon the defense of *alibi* and does not materially differ from instruction ''N'' asked by the defendant upon the same subject. The language in the instruction as given by the court, of which complaint is made, and not included in instruction ''N'' requested by the defendant, is found in an instruction upon the subject of *alibi* recently approved by this court. [State v. Barton, 214 Mo. 316; State v. Cushenberry, 157 Mo. 168; State v. Bryant, 134 Mo. 252.]

The only basis for an instruction upon the subject of *alibi* was the evidence introduced by the State tending to prove that the defendant made false statements as to his whereabouts, about the time of the commission of the crime, the evident purpose of such testimony being to show the consciousness of guilt of the accused, as a circumstance in the case. No evidence was offered upon this defense by the defendant. Under

this condition of the evidence, the law relative to the defense of *alibi,* as given by this court in the case of State v. White, 189 Mo. l. c. 351, is peculiarly in point. The court said: "The defense of an *alibi* was not interposed in this cause, and no testimony was offered by the defendant on that subject. The testimony of the State could not have furnished the basis for an instruction upon the defense of an *alibi,* for the reason that the statement of the defendant made to witnesses, introduced in evidence, that he was not present at the scene of the murder, was for the sole purpose of showing its falsity, and upon the theory that such false statement was a circumstance for the consideration of the jury."

However, as an instruction upon the defense of *alibi* was asked by the defendant, and such an instruction, free from objection, was given by the court, it is obvious that appellant has no just ground of complaint, and the subject need not be further pursued.

VI. Twenty-one instructions were given to the jury, eight of which were given at the request of the State, five at the request of the defendant, and eight by the court of its own motion. The only instruction given of which complaint is made in this court is the instruction upon the defense of *alibi* already considered. Therefore, so far as the instructions are concerned, it only remains to be considered whether the court erred in refusing instructions "A." to "P", inclusive, asked by the defendant, and whether the court erred in not fully instructing the jury on the essential elements of the crime charged and the defense interposed thereto.

Several of the refused instructions were given by the court in modified form, and were as favorable to the defendant as he was entitled to. Others were upon subjects which were fully covered by instructions given and which declared the law in accordance with the

decisions of this court. It is sufficient to say upon this point that we have carefully compared the refused instructions with the instructions given, and we are satisfied that the court fully instructed the jury in accordance with the requirements of the law, and that there is no merit in defendant's complaint.

VII.    Upon the request of the defendant, the court reporter took down the entire closing address of the prosecuting attorney to the jury, and the same is set forth *in extenso* in the bill of exceptions. During the course of the argument of the prosecuting attorney, many objections were made by counsel for defendant, on the ground of improper conduct in the remarks made and the language used. Some of the objections thus interposed were sustained by the court and the prosecuting attorney, in such instances, was properly rebuked and admonished. The remarks to which objections were made, but not sustained, are contained in the 15th, 16th, 17th and 18th grounds of the motion for a new trial. Some of the remarks of which complaint is thus made were in response to statements and challenges made in the argument of counsel for defendant.

The prosecuting attorney, in some respects, has an advantage over counsel for the accused in the presentation of the cause to the jury, and for that reason and because of the limits prescribed by the law, courts jealously guard the rights of the defendant and will not hesitate to grant a new trial on that ground alone when it is made to appear that the representative of the State, in his address to the jury, directly or indirectly, overstepped the bounds of legitimate argument, and by so doing deprived the accused of any right with which the law has clothed him. In this case the address of the prosecutor was an ingenious, strong and most forceful appeal to the jury, and while at cer-

tain points, when objections were made but not sustained, a near approach was made to the limits of what was permissible in argument, yet, after a full consideration of the subject, we cannot say that he was guilty of misconduct prejudicial to the rights of the defendant.

VIII. It is finally contended that the verdict is not supported by substantial evidence.

A full statement of the material facts upon which the State relies to sustain the verdict, accompanies this opinion; and, without repeating them here, we shall dispose of this contention by stating our conclusion that the evidence is amply sufficient to support the verdict of the jury.

The case was ably tried and hotly contested in the trial court. It has been fully and ably presented to this court. The defendant has been accorded and has availed himself of every right guaranteed by the law to a person accused of crime, and as the record is free from prejudicial error the judgment should be affirmed. It is so ordered. *Ferriss, J.,* and *Brown, J.,* concur.